**SHOSO NII v. McGRATH, Attorney General.**

Civ. No. 837.

United States District Court
D. Hawaii.

June 26, 1951.

Shiro Kashiwa, Honolulu, Hawaii, for plaintiff.

Howard K. Hoddick, Acting U. S. Atty., District of Hawaii, Honolulu, Hawaii, Leon R. Gross, Sp. Asst. to the Atty. Gen., for defendant.

J. FRANK McLAUGHLIN, District Judge.

1. The Statement of the Case

The present cause is before this Court for the second time. The prior history of this case is to be found in Shoso Nii v. Clark, D.C., 81 F.Supp. 1003; and in 181 F.2d 1013, in which the Court of Appeals for the Ninth Circuit set aside its unreported decision of March 6, 1950, and reversed the judgment of this Court and remanded the cause.

The precise text of the pertinent part of the mandate of reversal and remand was as follows: "* * * this cause * * * hereby is remanded to the said District Court for consideration of the issue respecting the transfer of the property vested by the appellee [the defendant here], to Nii by his father on his departure for Japan or on his death, and the issue respecting the claimed right to the income therefrom upon the depositions and other evidence now adduced and other evidence which may be procured and hereafter adduced."

The mandate was received by this Court on July 6, 1950. Subsequently to that time, the following events have occurred:

(a) The parties took another deposition from Kaneichi Nii, the plaintiff's father, in Japan during November and December, 1950.

(b) As an outgrowth of a "Request-for-Admission" skirmish under Rule 36 of the Federal Rules of Civil Procedure, which indicated that the plaintiff had served in the Japanese Imperial Army during World War II and had admittedly lied with regard thereto in applying for a United States passport in April, 1947, the plaintiff filed in this Court, under 8 U.S.C.A. § 903, a suit against the Secretary of State praying for a judicial declaration that he had not lost his United States citizenship by serving in the Japanese Army. That suit, Civil No. 1025, is now at issue, but has not been moved on for trial.

(c) The defendant, on December 19, 1950, moved, under Rule 60(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

---

4. McManus v. Jessup & Moore Paper Co., Civ. No. 8015 (E.D.Pa.1948).

for this Court to request the Court of Appeals to clarify and enlarge its mandate. This motion was denied on January 16, 1951.

(d) On February 27, 1951, evidence was received in this case within the framework of the mandate.

(e) On March 14, 1951, the grand jury indicted the plaintiff for violation of the Passport Act, 22 U.S.C.A. § 220, now 18 U.S.C. § 1542. On April 27, 1951, the indictment was dismissed as barred by the statute of limitations, because of the inapplicability of the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287. U. S. v. Shoso Nii, D.C., 96 F.Supp. 971.

## 2. The Boundaries of This Court's Jurisdiction Under the Mandate

As has already been indicated, some question has arisen as to the precise meaning of the mandate sent down by the Court of Appeals. As I construe it, the statement that the cause is remanded to this Court "for consideration of the issue respecting the transfer of the property * * to Nii by his father" leaves open to the further factual determination of this Court the entire primary question as to whether there was *any* transfer at all, either legal or equitable, from father to son.

The foregoing construction has guided this Court in the additional proceedings that have been had since the receipt of the mandate.

## 3. Summary of the Evidence Adduced at the Supplemental Proceedings

Upon the primary issue specified in the mandate, the parties adduced additional evidence, which may be summarized as follows:

1. Although the plaintiff's wife was available during the earlier trial, the plaintiff produced her as a witness only at the supplemental proceedings. She testified in some detail regarding the so-called "last supper" of the Nii family, held on the eve of the departure of Kaneichi Nii, the plaintiff's father, for Japan, in May, 1935. See 81 F.Supp. at page 1004.

According to Mrs. Nii, at that supper meeting, held in the kitchen of the Nii store at Waipahu, Oahu, the father "told us that all the property were for you people, and that you should hereafter strive to do your best and be a success." The witness explained that by "you" the elder Nii meant the plaintiff and herself.

Mrs. Nii also quoted the father as saying that he was leaving Takako Nii, a sister of the plaintiff, "to me to see that she is well cared for"; and that he had given "the property" to the plaintiff. The plaintiff's wife added that the elder Nii had told her on numerous occasions prior to this supper meeting that he "had given all the property to Shoso."

Elsewhere in her testimony, Mrs. Nii stated that she thought that "all of the property, including the store," was given to Shoso before she came back to the Territory, which was in June, 1934. She said that her sister told her that "in spite of Shoso being young * * * it seems that the property has been changed to Shoso's name." Mrs. Nii testified that she believed that the property had been turned over to Shoso before their marriage, which took place on June 7, 1934. It was not until some other Waipahu River property—not involved in the instant case—was sold by the elder Nii to one Oliver Kinney in 1941 that she found out that it was not in Shoso's name, Mrs. Nii testified, explaining that she learned the true situation when a power of attorney was sent to Shoso from Japan in order to enable him to sell the property. The plaintiff's wife indicated later in her testimony that she learned about the title when the property was "to be sold" to Mr. Kinney. Actually, however, the power of attorney to Shoso was executed on February 7, 1939. See 81 F.Supp. at page 1007. That was two years before the sale to Kinney.

Mrs. Nii also testified concerning a conversation that she had had with a Mr. Yokomoto in Honolulu, shortly before he was to depart for Japan, in the latter part of 1950. Her testimony as to that conversation, in so far as it is relevant here, can be better understood if it is given verbatim:

511

"Q. Did you also tell him [Mr. Yokomoto] to tell Mr. Kaneichi Nii in Japan to quit talking so much, he was hurting your case over here? A. *That was not with reference to this case.* I told him not to talk too much about Shoso's having served in the army over there, and all kinds of rumors will start.

"Q. What other case than this case was Shoso Nii involved in on the night that you talked to Mr. Yokomoto at his house? A. *I do not think he was involved in any other case besides this one.*" (Emphasis supplied.)

Mrs. Nii's inconsistency in this matter indicates that she was more interested in helping her husband than in historical accuracy!

Florence Takako Nii, the plaintiff's sister, testified that Kaneichi Nii was a man of few words; that he had "always said that whatever he owned in Hawaii will be Shoso's in the event that he leaves for Japan, which he was planning for some time, or at his death, whichever comes first"; that at the family supper on the night prior to his departure, the elder Nii said that his property was Shoso's, told the witness to "obey" her brother, and admonished his son to take good care of the property and make a success of it.

Florence had acted as interpreter for her father in Japan when he gave his first statement before the American vice consul at Kobe, Japan, on October 19, 1948. She testified that the taking of the father's deposition was "very informal"; that no shorthand reporter was present; that the vice consul took the answers down in pen and ink; and that the typewritten document was prepared "after all the questioning and answering was finished."

Despite her efforts to infer that Kaneichi Nii said something different from what appeared in the official deposition, the witness admitted that "the questions and answers were gone over once before it was signed," and that she "and the official interpreter for the consulate read the questions and read the answers to [the] father in Japanese * * * before he signed it."

Since the plaintiff has persistently contended that a certain passage in the 1948 deposition was not correctly translated, Florence was asked to give her rendering of the disputed question and answer.

The official translation of the passage in question is as follows: "13. Q. What did you do with all of your real properties in Hawaii when you last left Hawaii for Japan? A. After returning to Japan, I made a power of attorney to Shoso Nii at the American consulate in Kobe about December, 1935, to dispose of my properties in Hawaii."

This official translation was substantially identical with versions of the same passage given under oath during the supplemental proceedings by two competent and disinterested Japanese translators—Susumu Fujii and attorney Masaji Marumoto.

Florence's version of the question was in substance the same as that of the other translators, but her rendering of the answer was as follows: "After returning to Japan I made a Power of Attorney at the American consulate in Kobe some time in December 1935 to dispose of the property to Shoso Nii."

The translation given by the witness Florence Nii, therefore, would indicate that the father in 1935 made a legal transfer of all his property in Hawaii to his son Shoso.

The sister's desire to help Shoso in every way within her power is not only inferable from the fact her father exhorted her to "obey Shoso" at the last supper meeting, but also from the woman's own testimony that the family group is very close, that she has a very high regard for Shoso, and that she "certainly" would do anything she could to help him.

Under all the circumstances, therefore, I see no reason for not accepting the official translation, which shows that the elder Nii's intention was to give his son only a power of attorney and not a deed of sale.

The plaintiff was put on the stand by the defendant for the purpose of attacking the former's credibility, in connection with the earlier trial. At that time, while under oath, he had stated to the Court that he was exclusively an American citizen. At this

supplemental hearing, he was asked by the defendant's attorney whether he denied that he was "a citizen of Japan only." At that juncture, the Court took over the examination, and asked the plaintiff whether his earlier answer had been correct. The plaintiff replied in the affirmative, asserting that he was born in this Territory, that this is his home, and that he believed that he was a citizen of this country only.

The defendant's attorney then asked the plaintiff whether the latter, in a verified application for a passport presented at the American consulate in Kobe, in 1947, to return to the Territory, had stated that he was a citizen of Japan. The plaintiff replied in the negative. The attorney then produced a photostatic copy of a form made out by the plaintiff at Kobe, containing the statement "I (do) possess Japanese nationality."

Another statement in the same application was as follows:

"I did not enter or serve in the Japanese Armed Forces, as evidence of which I present the following documents:

"I submit a certificate from the local village master that I did not serve in the Japanese army because of physical disability."

When confronted on the witness stand with this document, the plaintiff admitted that he had been in the Japanese army, but added that since he had been "forced" into it, "anything which was forced upon me and which I wasn't willing to do, I wouldn't say was service."

The plaintiff then followed up this unimpressive rationalization by admitting that he induced his "brother-in-law, who was a village official, to make a false affidavit," which he gave to the American consul, so that the latter would rely upon it in issuing a re-entry permit to him.

That the plaintiff well knew that he had lied to the American consul is evidenced by his admission: "If I told the United States Consul the truth, then I wouldn't be able to come back to a country which I only love and want to be back, so I made the statement."

He also admitted that he had gone to the Immigration Office in Honolulu and "had endeavored to make a clean breast" of his "prior perjury."

The plaintiff testified that his father had written him a letter in which the elder Nii stated that he was "worried" because Shoso had been in the Japanese army. Shoso was then interrogated as follows:

"Q. I understand you to say he was worried because you had been in the Japanese Army, or was he worried because you had lied about your being in the Japanese army—which? Do you understand my question? Your father wasn't worried that you had been in the Japanese army; he was worried because you had lied about being in the Japanese Army, is that right? A. Well—

"Q. Would you prefer not to answer that question? A. Yes."

Like his sister Florence, the plaintiff professed to interpret the elder Nii's disputed statement before the American consul at Kobe as being: " * * * to dispose of my property to Shoso Nii I gave him a Power of Attorney."

We turn finally to the various conflicting statements made in Japan by the elder Nii. We have already considered his statement of 1948, before the American consul at Kobe. In a statement made at Saeki-gun, Hiroshima-ken, Japan, on June 6, 1950, he swore that his answer in 1948, concerning the power of attorney was as set out in the official translation. He also said that before leaving for Japan he "verbally conveyed the store," but not the land at that time to his son, who thereafter paid the land tax in his father's name; that he signed the power of attorney in 1935 at Kobe because his son sent it to him; that his son did not request a conveyance at that time; and that when he returned to Japan, all his children, including Shoso, were dual citizens.

In response to certain interrogatories ordered by this Court in November, 1950, to be propounded to Kaneichi Nii at the United States consulate at Kobe, however, he testified that when his son left school to work in the Waipahu store, he promised

Shoso that he would give the latter all his properties in Hawaii if the son "quit school and worked at my store after I returned to Japan or died, whichever happened first"; that he performed his promise; that he didn't execute a deed of conveyance because he had no time, since he received word from Japan that his daughter was seriously ill.

In reply to cross-interrogatories propounded by the defendant, Kaneichi Nii asserted that he had made the statement of June 6, 1950, as it appears in evidence here, and that the copies of the powers of attorney mentioned in that statement, which copies have been filed in this Court, are true and correct.

Answering redirect interrogatories by the plaintiff, Kaneichi declared that the answer, referred to above, that he had "verbally conveyed the store" prior to his return to Japan in 1935, but "did not convey the land at that time," was not correct. The proper answer, he said, should have been as follows: "About the store, I conveyed it to him [Shoso] at the beginning of 1933 by a Bill of Sale and at that time did not make out any papers, but I told him verbally that the land is yours, so do not worry about that."

Finally, in additional redirect interrogatories, the plaintiff made a final effort to shake his father's statement of June 6, 1950, to the effect that, in his statement before the American consul at Kobe in 1948, he had deposed that, at the same consulate in 1935, he had made a power of attorney to Shoso "to dispose of my properties in Hawaii." In those final redirect interrogatories, he was asked:

"Which is the correct translation of your quoted answer?

"1. 'After returning to Japan, I made power of attorney to Shoso Nii at the American Consulate about December, 1935, to dispose of my properties in Hawaii.'

"2. After returning to Japan, to dispose of my properties to Shoso Nii, I made a power of attorney at the American consulate in Kobe at about December 1935."

Kaneichi's reply was: "A. Second one."

## 4. The Plaintiff Has Failed to Support His Case by A Preponderance of the Evidence, on the Primary Issue Covered by the Mandate

The keystone of the plaintiff's case is his own testimony. To that testimony I give no credence, because he has repeatedly lied to this Court, and admittedly he has lied to the American consul at Kobe. I reject as absurd his rationalization that, because his service in the Japanese Army was "involuntary," it was not "service" at all.

The plaintiff is here seeking to establish an equitable title. But he does not come into court with clean hands. He is a confessed perjurer and a confessed suborner of perjury.

Nor is the testimony of the plaintiff's relatives impressive. The evidence is that this is a "close" family: each member seeks to support the son's case as well as possible. As we have seen, the wife's testimony is not self-consistent. Sister Florence has been admonished by the father to "obey" Shoso, and has admitted in open court that she would do "anything" to help him. The welter of contradictions in the ailing old father's various statements and depositions demonstrates that he, too, is subject to the family pressures.

To understate the matter: The plaintiff has failed to prove his case by adducing a preponderance of evidence.

## 5. Conclusion.

As to the primary issue presented by the mandate, this Court is of the opinion that there was never an equitable or legal transfer made of Kaneichi Nii's property in Hawaii here in question to his son Shoso; that there was indeed a promise by the father to give the son the Waipahu store; that this promise was carried out by means of a bill of sale transferring the store to Shoso, which bill of sale was in evidence at the earlier trial, 81 F.Supp. at page 1007; that at no time has either father or son treated the property here in issue as belonging to any one other than the father; that this understanding is evidenced by the powers of attorney executed by the

father at Kobe in 1935 and in 1939, 81 F. Supp. at pages 1005 and 1007, by the son's failure to ask for a deed of conveyance, by the son's continual payment of the land taxes in his father's name, by the father's reference to the real estate which is the subject matter of these proceedings as "my properties in Hawaii", 81 F.Supp. 1007, and by the plaintiff's own action in purchasing in his father's name in 1938 the smaller parcel of land involved here.

As to the second issue presented by the mandate—namely, "the claimed right to the income" from the disputed property—this Court's findings as to the plaintiff's lack of title, either legal or equitable, dispose of the question of any income that might be due to him. So far as the income due to the defendant is concerned, that question was disposed of in Findings 17–21, inclusive, and Conclusion of Law No. 3 at the earlier trial, 81 F.Supp. at pages 1007–1008. No new evidence on this subject was introduced during the supplemental proceedings to which the present opinion refers.

The defendant will prepare and submit proposed Findings of Fact and Conclusions of Law in accordance with this opinion.